No. 96-608

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

JOSE ANTONIO HUERTA,

    Defendant and Appellant.

FILED

OCT 30 1997

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable James E. Purcell, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Kevin E. Vainio, Attorney at Law, Butte, Montana

    For Respondent:

        Hon. Joseph P. Mazurek, Attorney General;
Jennifer Anders, Assistant Attorney General;
Helena, Montana

        Robert M. McCarthy, Silver Bow County Attorney,
Butte, Montana

Submitted on Briefs: July 31, 1997

Decided:    October 30, 1997

Filed:

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The defendant, Jose Antonio Huerta, was charged in the District Court for the Second Judicial District in Silver Bow County with one count of assault, a felony, in violation of § 45-5-201(1)(a) and (3), MCA. The State's information alleged that on August 19, 1995, Huerta inflicted bodily injury on a juvenile less than fourteen years of age. Following trial by jury, Huerta was convicted of the crime charged. Huerta appeals his conviction. We affirm the judgment of the District Court.

The issues on appeal are:

1.     Did the District Court violate § 46-15-323(8), MCA, when it required that Huerta disclose summaries of witness testimony prior to trial?

2.     Did the District Court violate Huerta's right to due process when it placed no reciprocal burden on the State to prepare and disclose summaries of witness testimony prior to trial?

3.     Did the District Court err when it excluded testimony from defense witnesses on the basis of relevancy and on the basis that the testimony would constitute inadmissible character evidence?

4.     Did the District Court err when it admitted testimony from the victim's treating physician which repeated out-of-court statements made to him by the victim?

5.     Did the District Court violate § 46-13-104, MCA, and deprive Huerta of due process when it waited to decide the State's motion in limine until after the defendant had called his first witness?

2

6.     Did the District Court deny Huerta's Sixth Amendment right to present a defense and his due process right to a fair trial when it disallowed testimony proffered by Huerta and commented regarding the merits of his defense?

## FACTUAL BACKGROUND

The defendant, Jose Antonio Huerta, was involved in a relationship with Brenda, the mother of Thymer, age eight at the time of trial, and Bobby Jo, age seven.

On the morning of August 19, 1995, Brenda asked Huerta to take Thymer's bicycle to the pawn shop. Later that afternoon, Huerta called Brenda from his house and explained that he and Thymer had decided that Thymer did not have to sell the bicycle. Huerta also told Brenda that Thymer threw up on the floor of his house, and that he had Thymer clean it up.

When Brenda later arrived at a residence which Huerta was helping to repair, she testified that Thymer was sitting in the front seat of Huerta's car with his head down.

Brenda eventually took Thymer home where, according to her testimony, she first discovered his injuries. Brenda testified that, once in the house, Thymer said he was going to be sick and ran to the bathroom. Moments later, she found him lying on the bathroom floor. Brenda saw a large bump on his head and asked what had happened. Thymer said "I can't remember." According to Brenda, when she asked again, Thymer said "you promise that we never have to see Tony [Huerta] again?" When Brenda gave her promise, she testified that Thymer said "Tony [Huerta] did this to me." Brenda took Thymer to the police and then to St. James Hospital.

3

Dr. Dennis Salisbury, Thymer's treating physician, testified at trial that he spoke directly with Thymer outside of Brenda's presence to obtain information regarding Thymer's injuries for purposes of treatment. Dr. Salisbury testified that Thymer told him that "Tony [Huerta] pick[ed] me up by the hair" "lots" of times. When Dr. Salisbury asked Thymer how he came to have bruises on his body, Thymer answered that he thought it was from being picked up by the shirt. Thymer also allegedly told Dr. Salisbury that Huerta choked him and slapped him across the face.

According to testimony of the officer at the police station, Thymer told the officer that Huerta grabbed him by the hair, lifted him up off the ground, and dropped him. Thymer also told the officer that Huerta "body slammed" him onto the couch at Huerta's house.

At trial, Thymer testified that while they were driving to the pawn shop on the morning of August 19, 1995, Huerta pulled Thymer's hair and said "bad words" to him. He also testified that at Huerta's house Huerta spit in Thymer's face, made him stand at attention, then kicked him over while he was trying to clean up his own vomit. Thymer said that he passed out during the assault and when he came to, Huerta was slapping his face. Thymer testified that he did not know how he got the bruises or the knot on his head. Thymer testified that once they left Huerta's house, Huerta threatened to kill his family if he told his mother about what happened.

Thymer spent three days in the hospital under observation. Dr. Salisbury found tenderness in Thymer's scalp area where his hair was missing. He also found fresh abrasions under Thymer's left jaw, above his left eyebrow, on his chest, and above his knee. He found

4

bruising under Thymer's left ear, under his right jaw, below his right shoulder blade, and on the front of his right leg. Thymer was also diagnosed with strep throat.

The defense theory of the case was that Brenda, not Huerta, inflicted the injuries to her son following an incident of vandalism the night before Huerta's alleged assault on Thymer. Huerta testified that Brenda disciplined her children with a paddle, which he had seen her use on Thymer. Huerta explained that Brenda was always having trouble with Thymer and typically punished him severely. According to Huerta, on the morning of the alleged assault, Brenda exhibited anger towards Thymer and used a hostile tone of voice when speaking to him. He further explained that Thymer wanted to get out of the house and away from his mother. Huerta testified that he and Thymer drove to his house where Huerta, a former marine, made Thymer stand at attention while he checked his phone messages. He also explained that Thymer threw up twice that day, once while lying on Huerta's couch and once in the bathroom of a rental unit in which they were working. Huerta testified that he heard a loud "thud" when Thymer was throwing up and assumed Thymer had slipped and hit his chin on the toilet bowl. He also testified that while at his house, Thymer slipped on his way to the bathroom and fell onto his back and hit his head on the newly polished wood floor. Huerta denied pulling Thymer's hair, slapping him, "body slamming" him, or kicking him, and told the arresting officer that Thymer liked to make up stories. At trial, all of the witnesses who saw Thymer that day testified that Thymer did not appear to be injured.

## PROCEDURAL HISTORY

Eleven days prior to the date on which trial was originally scheduled, Huerta filed a list of twenty-six witnesses whom he intended to call at trial to establish that Brenda, Thymer's mother, had a habit of severely punishing Thymer. The State responded by filing a motion in limine to exclude the witnesses on the basis that their testimony would be inadmissible character evidence pursuant to Rule 608, M.R.Evid.

The District Court, concerned with the delay the number of witnesses would cause at trial, ordered Huerta to prepare summaries of the witnesses' testimony in the form of affidavits. Huerta objected, but complied with the court's order by providing affidavits from ten witnesses. In summary, these witnesses would have testified that: the children were not very well-behaved around Brenda; it did not appear that the children were afraid of Huerta; Brenda spanked Thymer, pulled his hair, and yelled at him often; Brenda always complained about her children's behavior; Brenda beat Thymer with a paddle on occasion; witnesses had observed bruises on Thymer's legs; Thymer told others that he did not like his mother; and that Brenda's attitude toward her children was indifferent.

In addition, one of the affidavits established that Brenda asked a babysitter to discipline Thymer, and he complied. The next day, after finding bruises on Thymer, Brenda went to the police and had charges filed against the sitter, which resulted in a deferred prosecution.

The District Court ruled that these witnesses would be allowed to offer an opinion as to Brenda's reputation for truthfulness or untruthfulness pursuant to Rule 608, M.R.Evid.

6

However, the court held that evidence of Brenda's past disciplinary actions was irrelevant to any of the issues in the case. To the extent that the evidence might have been relevant, the court concluded that it was improper character evidence pursuant to Rule 608, M.R.Evid.

## STANDARD OF REVIEW

The standard of review of a district court's conclusions of law is whether the court's interpretation of law is correct. *See Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686. *See also Kreger v. Francis* (1995), 271 Mont. 44_, 447, 898 P.2d 672, 674; *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. We have held that a judgment of conviction will not be reversed unless the error prejudiced or tended to prejudice the substantial rights of the defendant. *See State v. Vanella* (1910), 40 Mont. 326, 345, 106 P. 364, 371; *State v. Rhys* (1909), 40 Mont. 131, 134, 105 P. 494, 495. We have further held that in criminal cases no judgment will be reversed for technical errors or defects which do not affect the substantial rights of the defendant, and when the record is sufficient to establish the guilt of the defendant, a new trial will not be granted, even though there was error, unless it clearly appears that the error complained of actually impaired the defendant's right to a fair trial. *See State v. Ray* (1930), 88 Mont. 436, 446, 294 P. 368, 371; *State v. Dixson* (1927), 80 Mont. 181, 212-13, 260 P. 138, 150. Section 46-20-701, MCA, states that "[a] cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial."

7

We have held that it is up to this Court to decide whether an error affects the substantial rights of the defendant, and that the defendant must demonstrate prejudice from the record. *See State v. Bubnash* (1963), 142 Mont. 377, 393-94, 382 P.2d 830, 838; *State v. Straight* (1959), 136 Mont. 255, 264-65, 347 P.2d 482, 488. Prejudice in a criminal case will not be presumed, but rather must appear from the denial or invasion of a substantial right from which the law imputes prejudice. *See generally State v. Stuit* (1996), 277 Mont. 231-33, 921 P.2d 866, 869-70; *State v. Arlington* (1994), 265 Mont. 127, 150, 875 P.2d 307, 321.

## ISSUE 1

Did the District Court violate § 46-15-323(8), MCA, when it required that Huerta disclose summaries of witness testimony prior to trial?

The District Court, concerned with having to address objections to numerous defense witnesses, required Huerta to produce summaries of each witness's testimony in affidavit form. The District Court's intention was to use the affidavits to screen the witnesses' testimony in order to avoid wasting time. On appeal, however, Huerta contends that by doing this, the District Court violated § 46-15-323(8), MCA. We agree.

Section 46-15-323(8), MCA, states in relevant part:

> Upon motion of the prosecutor showing that the prosecutor has substantial need in the preparation of the case for additional material or information not otherwise provided for, that the prosecutor is unable, without undue hardship, to obtain the substantial equivalent by other means, and that disclosure of the material or information will not violate the defendant's constitutional rights, the court, in its discretion, may order any person to make the material or information available to the prosecutor. The court may, upon request of any

8

person affected by the order, vacate or modify the order if compliance would be unreasonable or oppressive. <u>The defense counsel may not be required to prepare or disclose summaries of witnesses' testimony</u>.

(Emphasis added.)

The language of § 46-15-323(8), MCA, clearly states that a court may not require that a defendant prepare or disclose summaries of witnesses' testimony, the very thing the District Court in this case demanded of Huerta. We conclude that the District Court erred when it required Huerta to produce summaries of his witnesses' testimony. However, because Huerta claims no more prejudice than having to devote time and effort to the preparation of the summaries, we conclude that Huerta has not demonstrated prejudice and that the District Court's error did not affect his substantial rights. We therefore conclude that this procedural error is not a basis for reversal of the District Court's judgment.

## ISSUE 2

Did the District Court violate Huerta's right to due process when it placed no reciprocal burden on the State to prepare and disclose summaries of witness testimony prior to trial?

Huerta contends that by not requiring the State to prepare summaries of witness testimony, the District Court failed to place a reciprocal burden of discovery on the State and, therefore, violated his right to due process.

Article II, Section 17, of the Montana Constitution, provides that "[n]o person shall be deprived of life, liberty or property without due process of law." The Fifth Amendment to the United States Constitution guarantees that "no person . . . shall . . . be deprived of life,

9

liberty or property, without due process of law." Likewise, the Fourteenth Amendment to the United States Constitution provides "nor shall any State deprive any person of life, liberty or property, without due process of law." The due process provision of the Fifth Amendment is applicable to state action through the Fourteenth Amendment. *See Malloy v. Hogan* (1964), 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653.

In *Wardius v. Oregon* (1973), 412 U.S. 470, 93 S. Ct. 2208, 37 L. Ed. 2d 82, the United States Supreme Court held that reciprocal discovery is required by the due process fundamental fairness guarantee. The Court stated "[t]hat in the absence of a strong showing of state interests to the contrary, discovery must be a two way street." *Wardius*, 412 U.S. at 475, 93 S. Ct. at 2212, 37 L. Ed. 2d at 88. The Court added that "the State's inherent information-gathering advantages suggest that if there is to be any imbalance in discovery rights, it should work in the defendant's favor." *Wardius*, 412 U.S. at 475 n. 9, 93 S. Ct. at 2212 n. 9, 37 L. Ed. 2d at 88 n. 9. This Court recognized the reciprocal discovery requirement in our decision in *State ex rel. Carkulis v. District Court* (1987), 229 Mont. 265, 278-79, 746 P.2d 604, 613.

We conclude that the District Court did err when it imposed the burden of discovery on only the defendant, and not equally upon the State; however, once again, Huerta has failed to demonstrate how the error adversely affected the outcome of his trial. Having failed to do so, he has not established reversible error pursuant to § 46-20-701, MCA. Therefore, while we conclude that the District Court erred when it did not provide reciprocal discovery

10

obligations, we conclude that its error is not grounds for reversal of the District Court's judgment.

## ISSUE 3

Did the District Court err when it excluded testimony from defense witnesses on the basis of relevancy and on the basis that the testimony would constitute inadmissible character evidence?

The standard of review for evidentiary rulings is whether the district court abused its discretion. *See State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263. The determination of whether evidence is relevant and admissible is left to the sound discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *See Gollehon*, 262 Mont. at 301, 864 P.2d at 1263. *See also State v. Stringer* (1995), 271 Mont. 367, 374, 897 P.2d 1063, 1067; *State v. Passama* (1993), 261 Mont. 338, 341, 863 P.2d 378, 380; *State v. Crist* (1992), 253 Mont. 442, 445, 833 P.2d 1052, 1054. This standard presumes that there may be more than one correct answer to an evidentiary issue. Otherwise, there would be no basis for discretion. In this case, the choice faced by the District Court was whether to allow testimony of past abuse of Thymer by his mother, Brenda. Such a decision necessarily entailed first, a determination of whether the testimony is admissible, and second, whether the evidence, even though relevant, should be excluded on grounds of prejudice, confusion, or waste of time.

The testimony Huerta contends was admissible related to Brenda's past discipline of Thymer and Thymer's apparent feelings toward Brenda. Huerta offered to prove that, in the

11

past, Brenda requested that another care-giver corporally punish Thymer, that she has picked Thymer up by the arm and yelled at him, that she has acted indifferently toward Thymer, that she has pulled Thymer's hair when she was angry, that she has hit Thymer on the side of the head, and that she has thrown him into her car by his hair. Huerta's proffered witnesses would have testified that Thymer always seemed afraid of Brenda and never wanted to go anywhere with her. They noticed bruises on the backs of Thymer's legs and commented that Brenda regularly spanks her children, occasionally with a paddle, yells at them, and constantly complains about their behavior. One witness noted that it appeared that physical actions and yelling were the only forms of discipline used by Brenda.

Huerta offered this testimony to prove that it was Brenda's habit to severely punish Thymer and, therefore, infer that the injuries suffered by Thymer were inflicted by Brenda rather than him. The State objected to the introduction of this testimony on the grounds that it was inadmissible character evidence. The District Court agreed with the State and ruled that Huerta could not introduce any testimony regarding incidents of Brenda's past abuse of Thymer.

A case directly on point is *State v. Sigler* (1984), 210 Mont. 248, 688 P.2d 749. In *Sigler*, the defendant, who was on trial for causing the death of a nineteen-month-old child, objected to the introduction of testimony regarding the past history of the child's care by his mother and himself. The witnesses testified that they had seen Sigler kick the child, slap him so hard that his head touched his shoulder and his nose bled, spank the child hard while holding him in the air by his arm, and "whop" the child on the head when he would not eat.

12

*See Sigler*, 210 Mont. at 251-52, 688 P.2d at 751. The witnesses noticed bruises and cigarette burns on the child just weeks before the child's death and that the child seemed tense when Sigler approached him. *See Sigler*, 210 Mont. at 251-52, 688 P.2d at 751. Based on that evidence, we concluded that Sigler's "response to any perceived need for disciplining the child was always intemperate, and slipped into gear on the slightest provocation. His treatment of a nineteen-month-old infant was brutal, heedless, and unfeeling." *Sigler*, 210 Mont. at 253, 688 P.2d at 752.

In our decision in *Sigler* to affirm the District Court's admission of the witnesses' testimony we explained that "the only available link between the specific nature of the child's injury and the caretaker may be the evidence of prior abusive conduct by the caretaker." *Sigler*, 210 Mont. at 254, 688 P.2d at 752. We held that evidence of the defendant's past conduct was evidence of his habits.

The District Court in this case excluded the testimony of Brenda's past actions of abuse by characterizing the testimony as inadmissible character evidence in violation of Rule 404, M.R.Evid. We disagree with that characterization.

According to our decision in *Sigler*, a trait of character is to be distinguished from habit. "A habit is a person's regular response to a repeated specific situation." Rule 406, M.R.Evid. In *Sigler*, we explained that "[h]abit or routine practice may be proved by testimony in the form of an opinion or by specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine." *Sigler*, 210 Mont. at 255, 688 P.2d at 752. Huerta's intention was to establish, through the testimony of

13

numerous witnesses, that it was Brenda's habit to regularly respond to Thymer's misbehavior with abusive discipline. We therefore conclude, pursuant to our decision in *Sigler*, that the District Court erred by characterizing the proffered evidence as inadmissible character evidence. We conclude that the evidence was evidence of habit and absent other considerations, was admissible pursuant to Rule 406, M.R.Evid.

However, Rule 403, M.R.Evid., provides that although evidence may be relevant, a court may exclude it if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. While the District Court's explanation of why Huerta's habit evidence was excluded does not track the exact language of Rule 403, M.R.Evid., it appears that Rule 403 served as the basis for the District Court's decision.

In the process of determining whether to exclude the testimony of Huerta's witnesses, the District Judge repeatedly expressed concern that the witness testimony had no relation in time to Thymer's assault. He further stated that he thought the evidence was cumulative, repetitious, and that it frustrated the orderly administration of the trial. According to the District Court, Huerta could have established his defense that Brenda was actually the perpetrator of the assault on Thymer without using the testimony of numerous witnesses. The District Court explained that absent more direct evidence of Brenda's connection to the beating in question, the prejudice which these witnesses would have presented in the form of "character assassination" of Brenda far outweighed the probative value of their testimony.

14

We conclude that Huerta was able to sufficiently present his defense without the excluded testimony and that without a greater nexus between Brenda and her son's injuries on the date in question, the District Court did not abuse its discretion when it excluded evidence of Brenda's habit of disciplining her son.

## ISSUE 4

Did the District Court err when it admitted testimony from the victim's treating physician which repeated out-of-court statements made to him by the victim?

At trial, the District Court permitted Dennis Salisbury, M.D., Thymer's treating physician, to present testimony concerning Thymer's responses to questions he asked Thymer at St. James Hospital. The questions and replies included such matters as the origins of Thymer's injuries and who caused them. Specifically, Dr. Salisbury testified that he asked Thymer how he lost his hair, how many times he was picked up by the hair, how he received the bruises on his body, how many times he was choked, whether he was hit that day, who hit him, what was Huerta's last name, and whether he was slapped in the face or body. In some of his responses, Thymer named Huerta as the perpetrator. Dr. Salisbury testified that he obtained this and other information from Thymer for purposes of medical diagnosis and treatment. He specifically stated it was helpful to know whether the injuries were inflicted by an adult. Huerta objected to this testimony on the basis that it was hearsay. He contends that the questions went beyond those necessary for purposes of medical diagnosis and treatment.

15

Rule 803(4), M.R.Evid., provides that medical doctors, during their testimony, may repeat out-of-court statements elicited during the history-taking process, so long as a foundation has been laid to establish that the information was necessary for diagnosis and treatment. Rule 803(4) provides the following exception to the exclusion of hearsay evidence:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

In *State v. Arlington* (1994), 265 Mont. 127, 142, 875 P.2d 307, 316, we held that statements made for the purpose of diagnosis must first be made with an intention that is consistent with seeking medical treatment and, second, they must be statements that would be relied upon by a doctor when making decisions regarding diagnosis or treatment. Whether or not this two-part test has been met is an evidentiary issue which again involves the district court's discretion. *See Gollehon*, 262 Mont. at 301, 864 P.2d at 1263.

At trial, Dr. Salisbury specifically testified that his questions of Thymer, as well as Thymer's responses, were necessary for the purpose of medical diagnosis and treatment. Dr. Salisbury also testified that he relied on these statements in treating Thymer. Therefore, we conclude that the two-part test set forth in *Arlington* was satisfied and the District Court did not abuse its discretion when it admitted Dr. Salisbury's testimony.

16

establishes that the error was prejudicial as to the convicted person's guilt or punishment and that:

    (a) the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application;

    (b) the prosecutor, the judge, or a law enforcement agency suppressed evidence from the convicted person or the convicted person's attorney that prevented the claim from being raised and disposed of; or

    (c) material and controlling facts upon which the claim is predicated were not known to the convicted person or the convicted person's attorney and could not have been ascertained by the exercise of reasonable diligence.

(Emphasis added.) In this case, none of the three exceptions exist. Therefore, in order for this Court to review an alleged error by the District Court, Huerta must have objected to it at the time of trial. In *State v. Probert* (1986), 221 Mont. 476, 719 P.2d 783, we held that where the defendant alleged for the first time on appeal that a statute was unconstitutional, and where none of the exceptions of § 46-20-702, MCA, (renumbered § 46-20-701(2), MCA) were found to apply, this Court could refuse to consider the allegation on appeal. In *State v. Smith* (1986), 220 Mont. 364, 715 P.2d 1301, we held that where the appellant failed to object at the time the court made the alleged error, the objection was not timely. *See also State v. Hofman* (1996), 275 Mont. 455, 913 P.2d 1256; *City of Forsyth v. Allison* (1995), 274 Mont. 246, 908 P.2d 205; *State v. Walter* (1994), 266 Mont. 429, 880 P.2d 1346; *State v. Close* (1981), 191 Mont. 229, 623 P.2d 940.

In addition to requiring a timely objection, we have held that the objection must be specific in order to preserve the issue for appeal. In *State v. Loh* (1996), 275 Mont. 460, 479, 914 P.2d 592, 603-04, we held that a trial objection that is very general in nature and which does not specify what authority, rule, statute, or constitutional provision might be violated

We have held that "[a] trial judge must take care to insure that he does not abandon his role as impartial judge in favor of that of an advocate." *State v. Stafford* (1984), 208 Mont. 324, 331, 678 P.2d 644, 648. In *State v. Brooks* (1920), 57 Mont. 480, 490, 188 P.2d 942, 945, we held that if a judge exhibits to the jury his opinions with respect to the parties or the case, and it therefore becomes apparent that a fair trial has not been had, this Court should grant relief to the party prejudiced by the judge's remarks. Because the circumstances of this case demonstrate that, despite the judge's remark, Huerta was given a fair trial, we conclude, as we did in *State v. Cassill, et al.* (1924), 71 Mont. 274, 282, 229 P. 716, 719-20, that the judge's comment was merely a technical error and that Huerta's substantial rights were not prejudiced.

For these reasons, we affirm the judgment of the District Court.

_____
                                    Justice

We Concur:

_____

_____

_____

_____
            Justices

22

Justice W. William Leaphart, specially concurring.

I specially concur as to Issue Number 4--Did the District Court err when it admitted testimony from the victim's treating physician who repeated out-of-court statements made to him by the victim?

Rule 803(4), M.R.Evid., provides an exception to the rule excluding hearsay. The exception includes statements made by a patient to his/her physician as to symptoms, pain or the "general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." In the instant case, Dr. Salisbury, Thymer's treating physician, testified that, in responding to the doctor's inquiries as to the nature and cause of his injuries, Thymer said that Huerta was the one who had picked him up by the hair, had choked and hit him and slapped him in the face. I agree that the hearsay statements were admissible to the extent that Thymer described his injuries and how they were inflicted upon him. This information is pertinent to the diagnosis and treatment. I disagree that Thymer's statements identifying Huerta as the perpetrator were pertinent to the diagnosis or treatment. Huerta's defense to the charge was that Thymer's mother Brenda, not Huerta, was responsible for the injuries. The question before the jury was who had inflicted these injuries on Thymer, Huerta or Brenda? Since the doctor's hearsay testimony that Thymer identified Huerta as the perpetrator went to the heart of Huerta's defense and since the identity of the perpetrator was not essential to medical diagnosis or treatment, that aspect of the testimony should have been excluded.

However, although the doctor's hearsay testimony identifying Huerta was beyond the

23

scope of Rule 803(4), M.R.Evid., and was thus error, I would hold that it was harmless error given that Thymer testified at trial and specifically identified Huerta as the assailant who pulled his hair, spit on him, body slammed him onto the couch, kicked him, threw him against the kitchen wall and said "not to tell [his] mom" or "[Huerta] would kill [his] family." Since Thymer's hearsay statements to Dr. Salisbury were consistent with Thymer's trial testimony and since the trial testimony was subject to cross-examination, any error in admitting the hearsay was harmless.

W. William Brighurst
Justice